# Thomas Kean v. The Detroit Copper & Brass Rolling Mills.

*Negligence—Master and servant—Employment of incompetent fore-man—Duty of employé to obey orders—Contributory negligence.*

1. It must be regarded as negligence for a manufacturing company to place men who are accustomed to the habitual use to *excess* of intoxicating liquor in charge of business requiring the control and direction of persons operating dangerous machinery, and for any injury to such employés, arising from *such* cause, the company should make reasonable compensation, if it has knowledge of such intemperate habits.

2. Under the testimony in this case (see pp. 279–81), whether the plaintiff was directed by defendant's foreman, or from a fair interpretation of what he did and said on the occasion of the accident there was a direction to plaintiff, to wipe the rolls on the front side, were questions properly submitted to the jury.

3. Where a foreman and his assistant have equal knowledge of the danger accompanying an act about to be performed, even if the foreman requests its performance, and injury ensues to the assistant, the employer cannot be made liable; such performance being optional with the assistant, who takes his chances of the perils surrounding the situation. In such a case, where there is no dispute upon the facts, there is no occasion to go to the jury to determine whether the assistant ought to have obeyed such order.

4. When plaintiff entered into service of defendant, he assumed, not only the usual and ordinary risks and perils of the service, but also such other risks as became apparent by ordinary observation.[1]

Error to superior court of Detroit. (Chipman, J.) Argued May 5, 1887. Decided June 9, 1887.

---

[1] See *Smith v. Car Works,* 60 Mich. 501.

Case.  Defendant brings error.  Reversed.  The facts are stated in the opinion.

*C. A. Kent*, for appellant.

*Don M. Dickinson*, for plaintiff.

SHERWOOD, J.  The defendant in this case is a manufacturer of copper and brass materials, having its place of business in the city of Detroit, and in its works has a machine called the "Breakdown Rolls," the purpose of which is to reduce bars of the metal to thin plates.  The rolls are about 10 inches in diameter and 40 inches long, and run together at a speed of about 13 revolutions a minute.  When used they are placed from an eighth of an inch to an inch apart, according to the thickness of the plate desired to be made.  Oil is used upon the rolls, and they have to be cleaned from one to three times a day.  In attempting to clean the rolls from the wrong side, the plaintiff's hand was caught and drawn in between them, in consequence of which he lost the four fingers of his right hand.  It is for this injury, thus received, the plaintiff seeks to recover of the defendant in this action.

He states his case in two counts.  In the first, it is alleged—

"That plaintiff was an ordinary laborer engaged to pile scraps, and that he was ordered, against his will, to work as an assistant on the breakdown rolls, a dangerous employment, of the danger of which he was not informed, and while in such employment was directed by his foreman to wipe the rolls on a side which must certainly result in accident, and that the accident occurred in such wiping without plaintiff's fault."

The second count states—

"That plaintiff was employed as an assistant on a dangerous piece of machinery, under a foreman who was intemperate and incompetent, and that this foreman ordered the cleaning of the rolls, which would certainly result in accident," etc.

The verdict was for the plaintiff on both counts, awarding him the sum of $3,000.

The defendant brings error.

The testimony on the part of the plaintiff was given by himself, the foreman of the mills, and eight other employés of the company, so far as shown by the record, which purports to contain it all.

Plaintiff testified in his own behalf as follows:

"I am twenty-eight. Was born in Ireland. Came to this country at twelve. Worked on a farm. Sailed some. Had no trade. Never was in a machine-shop or rolling-mills until I worked for defendant. Went to work for defendant in January, 1882. Mr. Duxbury was then foreman of the shop. My business was to pile copper and brass scrap. Had nothing to do with the machinery, nor did I have to go near it. My wages were $1.40 per day. Was never directed to go about the machinery. I was injured between nine and ten, December 28, 1882. I was hurt at the breakdown rolls. They are very large. I went to the shop the morning I was hurt, and the first thing there was some wire bars we rolled. After that, Kelly, the foreman of the breakdown rolls, scoured the rolls, and said to me, 'I want you to wipe them off.' Then he went back to the back end of the shop. So I picked up some rags and wiped the rolls off on the side I always worked. When I thought they were clean enough, I started down the shop after the bars of metal, which had been run out of the furnace and were on the floor. As I started, I saw Kelly coming from the back door. When I got round the rolls, and got to the shears, I met Kelly. Kelly pointed to the rolls and said, 'I want you to clean those rolls better.'

"Q. On which side did he point?

"A. He pointed to the rolls.

"Q. On which side?

"A. He pointed to the side he was working on.

"Q. That was different from the side you had wiped on?

"A. He pointed to the rolls, and I went right up with him, —right side by side.

"Q. Tell what he said?

"A. He said, 'I want you to wipe them off better;' and I took the rags, reached right over on the platform, where we put the metal on, took the rags, and wiped the rolls off, and

he stood right along-side of me. He took hold of the screw that I supposed belonged to the rolls. I went to wipe off the top rolls, then I went to wipe off the bottom rolls, and I went right in.

" *Q.* Was that the same side on which you had wiped the rolls before that morning?

" *A.* No, sir.

" *Q.* On a different side?

" *A.* Yes, sir.

" *Q.* Did Kelly stand right by you when he told you to wipe those off?

" *A.* Yes, sir; we were both facing the rolls, and on the side where my hand went in.

" I could not tell exactly how long before that I went to work on the rolls. I was put on the rolls, off and on. The first time I was put on the rolls, Dick Jordan was sick, and I was put there until he came back. I was there only temporarily. My work on the rolls was to get the metal from the floor and put it on the platform. Then, as the metal was passed to me, I threw it on the carts, or the platform. I did not do the work of feeding the rolls; I only had the laborer's part. Jerry Howe, foreman of the shop, set me to work on the rolls with Kelly. It was a few days before the accident. Before that, I was working at the pickling tub with Al. Krantz. When Howe asked me to work on the rolls, I told him that I did not want to work on the breakdown rolls; I wanted to stay where I was. I told him that Kelly did not use me right. He said, ' I want you to go to work on there.' So I expected I would be discharged if I did not work with Kelly, and in a few days I got hurt.

" *Q.* On looking at the rolls, could you see whether they were moving or not?

" *A.* Yes, sir; I could see that they were moving all right, but I did not know the nature of the rolls, · or I would not have wiped them on that side. If I had been told anything about the rolls, I would have stopped when I went upon that side; but I did not know I would be drawn in; did not know the nature of it; was never told anything about it. I had never wiped the rolls on that side before.

" It was grease I had to wipe off the rolls. Kelly put it on. I can't tell how long after I attempted to wipe the rolls that my hand was drawn in; it might have been a few minutes. My hand was then injured the way it is now. After the accident I was taken to the office, and then to the hospital, where I stayed all that winter. In the spring I went back to

the shop, and was put in the wash room, rinsing out metal. I stayed there awhile, but was afraid I would catch cold. I then went to C. H. Buhl's hardware store, as a night watchman. It did not agree with me, and I went back to the shop, when Howe told me they had nothing for me to do."

On cross-examination witness testified:

"I did not continue to work steadily in the shop after I began until I was hurt. I was laid off a good many times. Every day I was there I saw and passed by the rolls. I can't tell when I first worked on the rolls. Duxbury first told me to work on them. I worked on the same side I always worked until I was hurt. I can't tell whether or not I worked on them as early as May, nor whether I worked on them at that time a month. I remember Jordan's being sick. I worked on the rolls while he was sick. When he came back I objected to working on the rolls longer, but Byington wished me to keep the place, and so I kept it. I went back to rolls in July, but can't say whether or not I was continuously working on the rolls from that time. My duties on the rolls were, I caught the metal as it came through the rolls. I cleaned the rolls whenever the foreman got through scouring them. If oil was put on, I might have to clean them twice or three times; if it wasn't, I cleaned them off in the evening once a day, for the whole time. I can't tell how many months I worked continuously on the rolls, for I was changed off and on. I was never told anything about the nature of the rolls. I don't remember whether or not I ever complained to the officers of the company about Kelly."

*Re-direct:* "I cannot exactly say how long at any one time I had served on these rolls. I had served more than two weeks at a time. I was called to work on them a good many times, how many I can't say, but I was never put permanently on them until the last time, less than a week before I was hurt. I had not been working on the rolls for six weeks previous to the time when I was last put on them."

*Re-cross:* "I cannot tell whether I worked on the rolls as much as six or eight months before the accident. I might have worked on them a month at one time, but I can't tell how many times."

Several of the other witnesses testified to the defendant's foreman, Kelly, being of intemperate habits; that on one or two occasions he had been permitted to give directions when under the influence of liquor, and had been known to keep

liquor at the rolling-mills; and witness Duxbury testified on the part of plaintiff that he was foreman at defendant's rolling-mills 15 months during 1881 and 1882, and knew Kean and Kelly, and saw the latter come in the shop intoxicated, and sent him home. Never saw him afterwards under the influence of liquor, "but saw him go out frequently into saloons, and I notified the superintendent, and for this he was discharged." He further testified that—

" The only danger about the rolls is that of getting caught between them. * * * It is never necessary to wipe the rolls on the front side. Wiping the rolls is the most dangerous work connected with the rolls, and there is no danger if you wipe them on the right side. * * * A man who had been employed as Kean had been, if put on the rolls, ought in a week to learn every danger connected with the rolls, and after that I should not think it would be necessary to tell him anything."

The defendant's testimony tended to show that the plaintiff worked in defendant's mills from the month of February to the month of December, 1882, both inclusive, and that he worked from $10\frac{1}{2}$ to $25\frac{1}{4}$ days in each month during said period.

Further evidence was also given tending to show that plaintiff began working on the rolls in April; that he worked there occasionally in April, May, and June; that he began to work on said rolls steadily in July, and worked there until the accident,—all the time he worked in the shop when the mills were in use, save two weeks; that prior to the accident Kean was commanded by his foreman, Kelly, never to clean off the rolls on the front side; that, on the day of the accident, Kean, in cleaning off the rolls on the proper side, had left them dirty, and that, in consequence, Kelly ordered him to finish cleaning them off; that at this time Kelly and Kean were about 35 feet from the rolls; that Kean went alone back to the rolls; that Kelly noticed him cleaning on the front side, and started to stop him, but that before he

reached Kean the accident happened; that Kelly turned up the screw after the accident for the purpose of releasing Kean.

That Kelly was discharged by defendant, July 7, 1882; that he was re-employed November 9, 1882, on promise of future good conduct; that from that time until after the accident he was never under the influence of liquor in the defendant's mills; that on the day and at the time of the accident he was perfectly sober, and assisted in releasing plaintiff from the rolls, and had him in his subsequent care until taken to the hospital.

The record states the foregoing is the substance of all the testimony given for the defendant.

Thirteen errors are assigned upon the various proceedings had in the case at the circuit. Counsel for defendant, however. reduces these to four, which, stated in his own language, are as follows:

"1. The evidence of intemperance in the foreman, Kelly, should have been rejected, and the second count, based on the charge of such intemperance, should have been taken from the jury.

"2. The court should have charged that there was no evidence that plaintiff was ordered to clean the rolls on the wrong side by his foreman.

"3. The court should have charged that plaintiff must have known that it was dangerous to clean the rolls on the wrong side, and that no command of his foreman excused his running the risk.

"4. The court erred in allowing counsel for the plaintiff to discuss to the jury his theory of what the law ought to be, and the conduct of the Michigan Central Railroad Co."

The first proposition relates to the intemperance of Kelly, and its effect upon his capacity to properly discharge the duties of his position. The proof clearly shows that Kelly, the foreman of the defendant, was a man of intemperate habits, accustomed to get intoxicated and drunk to such an extent as to incapacitate him to properly discharge the duties

of his position; that this was so understood by the defendant; and for that reason its superintendent discharged him from its service. It also appears that this habit of Kelly had for a long time been known to those in charge of the defendant's business.

There can be no question, I apprehend, at this late day, but that it must be regarded as negligence, and a want of ordinary care, in any of our large manufacturing institutions, to place men who are accustomed to the habitual use to excess of intoxicating liquor in charge of business requiring the control and direction of persons operating dangerous machinery, and that for any injury arising to the employed under the charge of an intoxicated foreman, arising from such cause, when the company has knowledge of such intemperate habits, it must and should make reasonable compensation. Intemperance was an agency tending to disqualify a man for the position Kelly held.

To what extent it had affected him in that direction, and what was his condition in this respect when he gave the direction to plaintiff claimed, on the day and occasion of the accident, were questions for the jury, and the evidence offered of Kelly's habits was in my judgment properly received, and the court committed no error in rejecting defendant's first proposition.

The second proposition required the court to instruct the jury that there was no evidence of the order of defendant, by its foreman, to plaintiff, to clean the rolls on the side he was injured. The testimony of Kean was to that effect. The defendant's direction, if any, to the plaintiff, on the occasion of the accident, was given by Kelly. The testimony of the plaintiff shows that he had, on the day of the accident, been told by Kelly to wipe off the rolls, and the plaintiff did so in the usual way, and left them; that he was met by Kelly about 35 feet from the rolls (as the other testimony shows), and Kelly told him, "I want you to wipe them off

better [meaning the rolls]," that he pointed to the rolls on the front side, and said, "I want you to clean those rolls better," and that Kelly went with him to the front side of the rolls, and that he stood right by the side of him when the plaintiff took a rag and reached over on the platform and wiped the rolls; that Kelly stood right by the side of him at the time, and took hold of the screw which held the rolls nearly together in their place; and the plaintiff then says: "I went to wipe off the top rolls, then I went to wipe off the bottom rolls, and I went right in." He further says, at this time: "We were both facing the rolls." Some of the testimony of plaintiff's other witnesses is corroborative of the statements of the plaintiff. It also appears, by the testimony of Duxbury, it was the plaintiff's duty to obey the demands and direction of Kelly.

Whether the plaintiff was directed by Kelly, or from a fair interpretation of what Kelly did and said on that occasion there was a direction to Kean, to wipe the rolls on the front side, were questions for the jury, and were very properly left to them to determine, in the view I take of the testimony. There was testimony from which they might find such direction by Kelly, and the ruling of the court was correct upon this proposition.

The third proposition is one of more difficulty. It requested the court to charge that the plaintiff must have known the danger to which he exposed himself in obeying Kelly's order, if he gave it, in attempting to clean the rolls on the wrong side, and that no command of the foreman excused the plaintiff's running such risk. There is no dispute as to the danger the plaintiff subjected himself to in attempting to clean the rolls on the wrong side, and it is difficult to understand, if the plaintiff was 28 years old, and a man of ordinary ability and understanding (and it is not claimed he was otherwise), how he could have been ignorant of the danger which surrounded this machine after working upon and about it

the length of time he did.    It is difficult to conceive such to be the fact.

The testimony for the defendant, which is not disputed, shows that the plaintiff worked most of the time for nine months on and about this machine before the accident occurred to his hand, and he says himself that every day he was there he saw and passed by the rolls; that his duties on the rolls were to catch the metal as it came through the rolls, and clean the rolls whenever the foreman got through scouring them; and that he cleaned them once a day the whole time he worked upon them, and sometimes two or three times a day, and always cleaned them from the same side until the day he was injured.    He further states that Duxbury first told him to work upon them.

Duxbury's testimony is to the effect that the only danger about the machine is that of getting caught between the rolls; that it is never necessary to wipe them from the front side, and that there is no danger if they are wiped on the right side; that no one who knows anything would try to wipe them on the front side ; that a man employed as Kean was, ought in a week to learn every danger connected with the rolls, and after that time it would not be necessary to tell him anything; that, if the foreman should tell an assistant to wipe the rolls off, he would be expected to do so on the back side; and he further testified that a man ordinarily intelligent, by wiping the rolls off on the proper side, ought to learn without instruction the danger of wiping off in front, in a week or ten days.

The plaintiff, however, testified :

"I could see by looking at the rolls that they were moving all right, but I did not know the nature of the rolls, or I would not have wiped them on that side.    *    *    *    I did not know I would be drawn in.   I did not know the nature of it; was never told anything about it."

Upon the undisputed testimony, I think there can be no

question but that the plaintiff was familiar with this machine, and I am not able to understand why he should not have known, as he stood in front looking upon those rolls turning rapidly in towards each other, catching and carrying a bar of copper an inch thick between them, and by the enormous pressure flattening it out into a thin sheet of metal not a half inch thick, that from a like contact with the rolls his hand, if caught and drawn in between them, would be crushed. Certainly, the peril, whatever it was, was plainly before him. He had but to look to be fully warned. There is no doubt but that, with proper care, the rolls could have been cleaned with safety. Such was the tenor of the testimony of plaintiff's witness Duxbury; but whatever there was of danger in doing it in this case was, I think, well known and apparent to the plaintiff when he made the venture. Had the danger been pointed out to him by all the other employes and agents of the company, it is difficult to see how it could be made plainer to him than it was as he stood there looking upon it.

If the experience the record in this case shows the plaintiff had with the machine was not a sufficient warning of the danger which he claims was unknown to him, it would hardly be expected that any specific instructions which the foreman or superintendent could have given would have furnished the plaintiff with better knowledge upon the subject, or would have been heeded by the plaintiff. The plaintiff does not say, in his testimony, that Kelly told him to clean the rolls on the front side at the time he received the injury, but stood by his side while he was doing it.

There was nothing in the superior position of Kelly at that time that made the danger any more apparent to him than to the plaintiff. He could judge as well as Kelly of the liability of his having his hand caught and taken between the rollers, if he attempted to clean them from the front side. It does not appear that either of them had ever known

or witnessed an accident of that kind; and I think, where both the foreman and assistant or helper have equal knowledge of the danger accompanying the act about to be performed, even if the foreman requests its performance, and injury ensues to the helper, the company cannot be made liable. Notwithstanding the request in such case made by the foreman, the servant can comply or not as he chooses, and if he does he takes his chances of the perils surrounding the situation. *Bell v. Western & A. R. R.*, 70 Ga. 566; *Patterson v. Pittsburg, etc., R. R. Co.*, 76 Penn. St. 393; *E. Tenn., etc., R. R. Co. v. Duffield*, 12 Lea, 63; *Baker v. Western & A. R. R. Co.*, 68 Ga. 706. Such I understand to be the law between the foreman and his helper when the former possesses no superior knowledge, and the dangers are apparent alike to both of them; and in such a case, where there is no dispute upon the facts, there is no occasion to go to the jury to determine whether the helper ought to have obeyed the order of the foreman or not.

The plaintiff when he entered into the service of the defendant assumed, not only the usual and ordinary risks and perils of the service, but also such other risks as become apparent by ordinary observation. *Gibson v. Erie Ry. Co.*, 63 N. Y. 449; *Baltimore & O. R. R. Co. v. State*, 24 Md. 271; *Hutchinson v. Railway Co.*, 5 Exch. 343; *Illinois Cent. R. R. Co. v. Cox*, 21 Ill. 20; *Sullivan v. M. & M. R. R. Co.*, 11 Iowa, 421; *Hayden v. Smithville Manf'g Co.*, 29 Conn. 548; *Lee v. Detroit Bridge & Iron Works*, 62 Mo. 565; *Pittsburg, F. W. & C. Ry. Co. v. Devinney*, 17 Ohio St. 197; *Foster v. Minnesota C. Ry. Co.*, 14 Minn. 360; *Anderson v. Milwaukee & St. P. Ry. Co.*, 37 Wis. 321; *Davis v. Detroit, etc., R. R. Co.*, 20 Mich. 105; *Mich. Cent. R. R. Co. v. Dolan*, 32 Id. 510; Cooley, Torts, 542; 2 Thomp. Neg. 976.

I think, under the circumstances of this case, the defendant's third proposition should be sustained, and the ruling of the court was error.

The fourth proposition refers to the remarks of Mr. Dickinson made in his closing argument to the jury. I do not think there was such a departure from the rules in what he said, urging upon the attention of the jury the reason and necessity for them to be vigilant in the examination of the case, as to be subject to the exception taken, or in stating his understanding of the law, and what he regarded as defects therein upon certain questions raised, requiring thorough investigation, and careful consideration of the facts.[1]

For the injury received by this plaintiff, under the circumstances appearing upon this record and undisputed, I do not think the defendant should be held liable.

The judgment should be reversed, and a new trial granted.

CAMPBELL, C. J., and CHAMPLIN, J. concurred.

MORSE, J. I concur in the result in this case, but not in all that is said by Mr. Justice SHERWOOD in his opinion.

---

[1] See *Battishill v. Humphreys*, 64 Mich. 514 (head-note 4) ; *Hart Manuf'g Co. v. Mann Car Co.*, 65 Id. 564 (head-note 1).