| 114 | 135 |
| 119 | 86 |
| 114 | 135 |
| 121 | 226 |
| 114 | 135 |
| 124 | 128 |
| 114 | 135 |
| 127 | 207 |
| 114 | 135 |
| s72ɴw | 145 |
| 130 | 503 |
| 114 | 135 |
| s72ɴw | 145 |
| 132 | 577 |
| 114 | 135 |
| d143 | 598 |

HAYBALL v. DETROIT, GRAND HAVEN & MILWAUKEE
RAILWAY CO.

MASTER AND SERVANT—DEFECTIVE MACHINERY—PROMISE TO RE-
PAIR—ASSUMPTION OF RISK—EVIDENCE.

An employé's eye was destroyed by a chip of metal's flying
from a metal planer which he was operating.  In an action
to recover damages for the injury, based upon the employer's
alleged negligence in failing to keep the machine in suitable
repair, so that chips should not be thrown from it, it appeared
that the plaintiff was a skilled machinist, acquainted with
such machines; that he had operated the particular machine
for 13 months; and that he learned of the alleged defect when
he commenced work.  The plaintiff testified that he used the
machine for 5 months without complaint; that he then ex-
plained the matter to the foreman, and asked leave to make
some repairs, but was informed that time could not be spared
to do so; that he told the general foreman, a few days before
the accident, that the machine was not fit to do good work,
and was told that it would be fixed as soon as it could be
reached in the course of repairs.  *Held*, that the testimony
did not support the theory that the plaintiff remained at
work, relying upon his employer's promise that the defect
should be remedied, and that, upon his own showing, verdict
should have been directed for defendant.

Error to Wayne; Smith (George W.), J., presiding.
Submitted February 11, 1897.  Decided September 14,
1897.

Case by Albert Hayball against the Detroit, Grand
Haven & Milwaukee Railway Company for personal in-
juries.  From a judgment for plaintiff, defendant brings
error.  Reversed.

*L. C. Stanley* (*E. W. Meddaugh* and *Geer & Wil-
liams*, of counsel), for appellant.

*Alfred Lucking*, for appellee.

Moore, J.   The plaintiff recovered a judgment against the defendant for injuries from a machine he claims was out of repair, from which judgment the defendant appeals, claiming the court should have directed a verdict in its favor.   If the case made by the testimony of the plaintiff himself is such as to authorize its submission to the jury, the verdict should stand; otherwise a verdict should have been directed for the defendant.

The plaintiff is a machinist.   June 23, 1894, he was in the employ of the defendant, using a machine called a "shaper."   This machine was used for the purpose of planing steel, cast iron, brass, and other metals, and giving them such shape as was necessary.   The shaping was done by means of a tool that traveled back and forth over the surface of the metal to be shaped.   The tool planed the metal as it moved forward, but did not cut the metal as it came back.   It is claimed the ways or guides in this machine were worn so that the machine was defective. Mr. Hayball testified of it:

"There was looseness in the ways, in the ram and saddle of the machine, and some play in the apron and screw of the machine.   *   *   *   To hold the ram in place, so that it would cut straight forward and back without budging, there were ways or guides fastened to the saddle of the machine.   *   *   *   The guides were so wide, compared with what they ought to be, as to allow the ram to move sideways, where it ought to go perfectly true."

It is claimed that, as the result of this condition, when the tool came to a hard spot in the metal which was being shaped, it would slip sidewise as far as the worn-out motion would allow it to go, that the tool would spring and turn, and that, as the ram would force the tool forward, it would dive into the metal, which would chip off and fly, as it would not do if the machine were in good order.   It is claimed by the plaintiff that, as a result of this defect, a chip of metal was thrown from the machine into his eye, June 23, 1894, which resulted in his losing one eye.

At the time of the accident plaintiff was 23 years old, and had been a machinist 5 years. He had been in the employ of the defendant 13 months. During all of this time he had worked on the same machine, and had worked on such a machine elsewhere, and was familiar with machines of that character. When he began to work, he says he discovered that the machine was defective, and used it 5 or 6 months, when he asked Mr. Rose, the foreman of the shop, to make some improvements upon it, and explained to Mr. Rose the condition of the machine upon two or three occasions, and that the machine was not fit to do a good job.

"I asked Mr. Rose, foreman of the shop under Mr. Bleasdale, who was the general foreman or superintendent in entire charge of the shop, if I could put in four set-screws, instead of this shim, or put in cast iron, to take up that lost motion; and he said, 'No; he hadn't time to do that;' said they were in a hurry for the work, and could not spare the time to do it; that is what he told me. He said to fix it up with these pieces of sheet iron, put shims in these places, as I had done before; and I did do that, did the best I could with the machine. I was unable to work so rapidly with the machine as was required. I had different talks with Mr. Rose—three or four—about this machine. The one when he told me to fix it as I had done before was about the time the machine was moved, —some time in February or May of the year I was hurt, —I would not be positive."

Plaintiff further testified that, a few days before he was hurt, he had a conversation with the superintendent, which he describes as follows:

"Mr. Bleasdale came along, and I says to him, 'Mr. Bleasdale, this machine isn't fit to do a good job.' 'Well,' he says, 'my boy, I know it, I know it;' he says, 'I am doing one thing after another as fast as I can.' That is what Mr. Bleasdale said,—he would very shortly come to it, would come to it very shortly. I spoke of the shaper, the machine I was working on, and he knew it. The conversation took place right at the end of the shaper. Bleasdale was coming through between the large lathe and the shaper; that is when I stopped him. There were

other machines that he was working on, fixing. I knew about how many machines there were in the shop. I relied on his statement that he would get to it and fix it."

After the plaintiff had testified in chief, he testified on cross-examination that the speed of the machine would make some difference about the chips flying, and that the man who runs the machine controls its speed, and the thickness of the chip that will be taken; that he had used the machine in practically the same condition for a year, without having any injury, except that he had hurt his thumb by using it to brush off the dust and chips, instead of using a brush. At the time of doing the work, he said he had his eyes pretty nearly on a level with the piece of work he was planing. "My eye was right in front of the piece I was planing, facing the machine, as the machine came towards me." He said his eye was 8, 10, or 12 inches back, and 4 or 5 inches above the piece he was planing. After the cross-examination was ended, this colloquy occurred:

"*Q.* (by juror): Did you consider that machine dangerous to work with the way it was?

"*A.* It was dangerous.

"*Q.* (by juror): Did you know it was dangerous at the time?

"*A.* I knew it was a dangerous machine, and I told them that.

"*Q.* (by plaintiff's counsel): Did you know that it threatened any sort of injury to you at all, or that it might?

"*A.* It might.

"*Q.* If not carefully handled?

"*A.* If not carefully handled.

"*Q.* When you had your talk with Mr. Bleasdale a few days before you were hurt, was anything said about the particular defects?

"*A.* I told him, and pointed out this same thing to Mr. Bleasdale, yes; I did.

"*Q.* Tell it to us.

"*A.* I pointed out these things to Mr. Bleasdale, the looseness here and everything, and I told him that the machine was defective, it wasn't fit to run; that is what I told him.

"*Q.* Just what did he say, as near as you can remember, about when it would be fixed?

"*A.* Mr. Bleasdale said that he was doing one thing after another as fast as he could, and he would get to it after awhile.    That is what Mr. Bleasdale said; he was doing one machine as quick as he could, and he was fixing one machine after the other, as fast as he could get to it.

"*Q.* Was he actually fixing the others,—you say that he was?

"*A.* Yes.

"*Q.* State whether you relied upon his statement?

"*A.* I did, certainly.

"*Q.* What would you have done if he had not promised to fix the machine?

"*A.* I was going to leave.    I had never been hurt before by this machine in this way of flying pieces."

He then testified on the cross-examination that he had worked the machine a year, knowing it was loose and unsafe, and that, when he returned to work after he had hurt his thumb, he knew the machine was then in just as bad condition as it had been before, and that on the morning of the 23d of June, when he commenced to work, he knew the machine was in just as bad condition as it had previously been in.    Both Mr. Rose and Mr. Bleasdale denied the conversations Mr. Hayball claimed to have had with them, and a great deal of testimony was introduced upon the part of the defendant showing that as late as the morning of the trial, two years after the accident, the machine was in substantially the same condition as at the time of the accident; was no worse about throwing chips than other shapers; and that all shapers used for planing metal would throw chips more or less, depending upon the kind and hardness of the metal, and the speed with which the machine was run, and the manner in which the tool and metal were adjusted.    Testimony was also given to the effect that the workman, in examining his work, should not have his eyes in line with and in front of the moving tool, but should be at the side, and examine it as the tool came back.

The rule in relation to the character of the machinery provided and used is stated as follows in Beach, Contrib. Neg. § 351:

"We have seen that the law requires the master to furnish safe and reasonably good machinery to his servant, and to keep that machinery in reasonably good order; or, in other words, that the law imposes upon an employer the duty of ordinary care, both as to furnishing the instrumentalities of labor and also as to keeping them in repair. And here it is necessary to be careful not to go further. The law imposes no further or higher obligation upon an employer than this. As a general rule, he is not under obligation to make use of the safest appliances and instruments, nor to change his machinery with every new invention, nor to introduce every supposed improvement in appliances."

This doctrine has had the approval of this court for many years. *Davis* v. *Railroad Co.*, 20 Mich. 105, 126. Another rule of law is stated as follows:

"The servant is held by his contract of hiring to assume the risk of injury from the ordinary dangers of the employment; that is to say, from such dangers as are known to him or discoverable by the exercise of ordinary care on his part." Beach, Contrib. Neg. § 370; *Kean* v. *Rolling Mills*, 66 Mich. 277 (11 Am. St. Rep. 492).

. Continued service after knowledge is a waiver of the defect or danger.

"It is the rule that if the servant, when the defect or danger is brought to his knowledge, when he discovers that the machinery, buildings, premises, tools, or other instrumentalities of his labor are unsafe or unfit, * * * continues in the employment without protest or complaint, he is deemed to assume the risks of such danger, and to waive any claim upon his master for damages in case of injury." Beach, Contrib. Neg. § 371.

It is claimed on the part of the plaintiff that he did make complaint, and that under the following authorities he is entitled to recover: *Hough* v. *Railway Co.*, 100 U. S. 213; *Lyttle* v. *Railway Co.*, 84 Mich. 289; *Roux* v. *Lumber Co.*, 85 Mich. 519 (24 Am. St. Rep. 102); *Schlacker* v. *Mining Co.*, 89 Mich. 253.

Beach on Contributory Negligence (section 372) states the rule as follows:

"If, when the master is notified of the defect in the machinery or of the incompetence of the servant, he promises to remedy it within a reasonable time, the servant will not, as a matter of law, be presumed to have consented to it, or to have waived his rights by remaining for such reasonable time in the service; but mere complaint to the master, unless a promise to repair is made, will not justify the servant in continuing to expose himself to the danger."

An examination of the cases above cited will show that none of them go far enough to make the defendant liable in this case. An examination of the cases cited, so far as they have any bearing upon the questions involved here, shows that the defect was one that made the continuous use of the machinery dangerous; that it was a temporary defect, and not one of long standing; and that there had been an unequivocal promise to remedy the defect. In the case of *Hough* v. *Railway Co.*, *supra*, the danger grew out of a defective cowcatcher, of which complaint had been made, and a promise given to repair. In *Lyttle* v. *Railway Co.*, *supra*, the danger grew out of the incompetency of a fireman. A switchman complained of the incompetency of the fireman, and because of his incompetency quit work. He was promised if he would return to work the fireman should no longer run the engine. He did return, relying upon the promise, and, without any knowledge that the fireman of whom he had complained was in charge of the engine, resumed his work. He was injured while the incompetent fireman was in charge of the engine. In the case of *Roux* v. *Lumber Co.*, *supra*, the danger grew out of a combination of bevel gear-wheels, which were usually covered in, but from which the covering had been broken by accident, exposing the machinery and making it dangerous. Complaint was at once made to the mill superintendent, who promised to fix it that night. It was not fixed, and the superintendent's attention was called to that fact in the morning. He then promised to fix it at noon. The acci-

dent occurred at 10 o'clock in the forenoon.    In disposing of the case the court made use of this language:

"It is urged that plaintiff's knowledge of the exposed and dangerous condition of this gearing was equal to that of his employer, and by continuing his work he assumed the risk.    This rule of law is not applicable to the circumstances of the present case.    The risk to which plaintiff was exposed on the day of the injury was not one ordinarily incident to his employment.    It was a temporary peril.    It did not arise until the day before the injury. In view of the danger this very machinery had been covered up.    Plaintiff, acting as a prudent man should, had on the evening before, and again on the very morning of the accident, notified the defendant of the fact that the gearing was exposed, and defendant had, in recognition of the danger, and of plaintiff's exposure thereto, promised to replace the covering, and instructed the plaintiff to continue his work until noon, when it should be done. There was no voluntary assumption of the risk on the part of the plaintiff.    He proceeded under protest."

In the case of *Schlacker* v. *Mining Co.*, *supra*, the danger arose suddenly.    The men were directed to go back to work, and were assured there was no danger.    Two hours later the injury was done.

The case at issue here is unlike any of these cases.    The plaintiff, when he commenced work, was a skilled machinist.    He at once learned the machine was defective. Without complaint, he continued to work with it for five months, when he says he made complaint to Mr. Rose. Instead of receiving a request to go back to work, and a promise to remedy the defect, he was told there was no time to repair the machine.    Instead of quitting, he continued his work for months afterwards, sometimes complaining to Mr. Rose, but receiving from him the same reply.    This continued until about a week before the accident, when he says he complained to Mr. Bleasdale.    Giving his version of this interview the most favorable construction possible, the plaintiff was told the machine would be repaired when they could get to it.

"Mr. Bleasdale said that he was doing one thing after another as fast as he could, and he would get to it after awhile. That is what Mr. Bleasdale said; he was doing one machine as quick as he could, and he was fixing one machine after the other, as fast as he could get to it."

Instead of protesting further, he again went to work with the dangerous machine, and, with his eye 4 or 5 inches above and 8 to 12 inches away from the source of danger, and directly in the line of the danger, proceeded with his work and received the injury. To hold that under such circumstances the employer is liable would be carrying the doctrine of liability further than it has ever been carried before. It would have the effect of making the employer an insurer of the safety of the employé from accident because of defective machinery. For cases bearing upon different features of the·questions involved, see *Swoboda* v. *Ward*, 40 Mich. 420; *Kean* v. *Rolling Mills*, 66 Mich. 277 (11 Am. St. Rep. 492); *Wheeler* v. *Berry*, 95 Mich. 250; *Redmond* v. *Lumber Co.*, 96 Mich. 545; *Breig* v. *Railway Co.*, 98 Mich. 222; *Shackelton* v. *Railroad Co.*, 107 Mich. 16. It is impossible to reconcile plaintiff's acts with the theory that he remained at work, after he learned the machine was dangerously defective, relying upon a promise from the defendant that it would remedy the defect. We think a verdict should have been rendered in favor of the defendant.

Judgment is reversed; no new trial ordered.

The other Justices concurred.