LAPIER *v.* BEAUBIEN ICE & COAL CO.

1. MASTER AND SERVANT—NEGLIGENCE—ASSUMED RISK.

A fireman who willingly enters upon a journey in a tug at so late an hour that he would arrive in the dark at a place difficult of navigation, and who was familiar with the situation and difficulties likely to be encountered, assumes the risk of any alleged negligence for starting at an unseasonable time.

2. SAME—DUTY DEVOLVING ON SERVANT.

Alleged negligence in the use of a towline full of kinks and turns, one of which caught and injured plaintiff, was not actionable, where plaintiff knew of the condition of the towline and might have remedied the defects.

3. SAME—INSUFFICIENT LIGHTS.

And plaintiff could not recover for failure to provide sufficient lights, where insufficient illumination resulted from the smoky condition of a light of which he and another servant were in charge.

4. SAME—NEW TRIAL.

The denial of a new trial on grounds which were disputed by affidavits of the opposing party was not an abuse of discretion.

5. SAME—NAVIGATION—CAPTAIN OF TUG.

With a crew of three persons besides the captain, and with two barges of ice in tow and the outfit aground in the dark, it cannot be said that the post of duty for the captain was in the pilot house, or the post of duty of the engineer in the engine house, all of the time.

6. SAME—MEDICAL ATTENDANCE—CARE.

No duty is imposed on a tug of under 30 tons burden, making trips of less than 40 miles on inland lakes, to have medical attendance and means of cure aboard for sick or injured seamen; and reasonable diligence is exercised where the captain puts into port without unnecessary delay and secures sufficient treatment and attendance.

Error to Wayne; Mandell, J. Submitted April 8, 1910. (Docket No. 46.) Decided September 27, 1910.

Case by Benjamin A. Lapier against the Beaubien Ice & Coal Company and others for personal injuries. A judgment for defendants on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed.

*F. C. Moriarty* and *Lehman, Riggs & Lehman,* for appellant.

*George F. & Peter J. Monaghan,* for appellees.

MOORE, J. This is an action in a plea of trespass on the case. The declaration contains two counts. The first count recites several concurring acts of negligence, which, it is claimed, caused the loss of the left leg of plaintiff. The second count charges unlawful neglect by defendants after the injury was received and before the limb was

amputated.  There was but one witness sworn.  This witness was the plaintiff.  At the conclusion of the testimony for the plaintiff, the judge directed a verdict for defendant.  Later a motion for a new trial was made, based not only upon the record as it then existed, but upon affidavits.  A counter showing was made by defendant.  The motion was overruled.  The case is brought here by writ of error.

It is claimed by plaintiff that defendant was negligent in at least three respects:

(*a*) That they were absolutely reckless in attempting to navigate Baltimore Bay in the darkness of the night without a compass or other instrumentalities for such a journey.

(*b*) That they were negligent in the use of a towline full of kinks and turns.

(*c*) That they were negligent in making the trip at the time and under the conditions without proper supplies and necessary instrumentalities.

The plaintiff was about 48 years of age.  He had been a fireman for more than 20 years, nearly all of the time on tugboats.  The defendant had a tugboat of 27 tons burden, called the " Frank J. Haines."  It was engaged in towing barges loaded with ice from Fair Haven, Mich., to Detroit, Mich., taking empty barges back to Fair Haven on the return trip.  Fair Haven is on the west shore of Lake St. Clair, and about 37 miles nearly north of Detroit.  In August the plaintiff became fireman on this tug, and continued in that capacity until his foot was caught in a towline, and he was drawn around the tow post on the 28th of October, 1904, and his leg badly crushed, so that it had to be amputated.  With this general statement we may proceed with the groupings of claimed negligence.

(*a*) It is asserted that the captain of the tug was negligent in leaving Detroit at half past 8 o'clock in the evening, which would bring him into the vicinity of Fair Haven when it was dark, instead of at daylight, which, it is claimed, would have resulted if his departure had been

delayed until half past 11 o'clock. As to the suggestion that the boat was without a compass, we do not find anything in the record upon that subject. The record discloses that the tug had made the trip daily to Fair Haven and back, though not at the same hours as upon this occasion, during all the time plaintiff was in defendant's employ. Plaintiff knew the situation. He knew how long it took to make the trip and the difficulties likely to be encountered. There is nothing to indicate that he did not enter upon this journey willingly. The situation at the time of the accident will be dwelt upon more in detail later.

(*b*) Under this head it is said it was negligent to use a towline full of kinks and turns. It is stated the captain knew this line was full of kinks and turns before it was put upon the tug. Plaintiff testified to this effect, and that the captain directed the line to be put upon the tug in that condition. This was a month before the accident happened. If the captain gave this direction, it does not appear why he gave it; nor does it appear that he did not expect the kinks would be taken out later when there was time to look after them. The plaintiff testified that Mr. Coleman was hired, and generally did the same sort of work he did.

"The captain when in the discharge of his duty is in the pilot house on the front end of the tug. The engineer is about the middle of the tug in the engineer's room. The tug was 14 feet wide at its widest part. My place was just forward of the engine room. Mr. Coleman generally did the same kind of work I was doing. Mr. Coleman helped me fire; once in a while he attended to the lines. We attended to the lights, etc., and keeping them in their places, and if Mr. Coleman had to make a line fast or anything it was his duty to do so; of course, both of us had to attend to those lines. I had been given directions by the captain while Coleman and I were there on the subject of the lines, and about helping and showing him, and the captain said to me: 'This man here ain't been on the boat before in his life. Of course he is a little green at the work, and you show him all you can.' And

I said, 'Yes, I will show him all I can,' and he said the boy had never been on the boat before and didn't know much about it, and he said further than that: 'Show him how to fire. He don't know anything about firing.' And he says, 'Show him, maybe he will get handy around the boat.' So I showed him all I could while I was there."

The plaintiff's account of the accident is as follows:

"On the day in question we left Detroit at 8:30. It was very dark that night when we got up in that same vicinity. It was a very dark night. In hauling ice back and forth we took up an empty barge and went down with one loaded. The barges are a good deal larger than the tug. I should say a barge would be two or three times as large as a tug. On the night in question we were taking up two empty barges of about the same size. On that night we run aground twice in going up there, once opposite to Mt. Clemens, and we got off there and went on from there until we touched the mud bank. At that time we was somewhere around New Baltimore, as near as I can tell. We got stuck in the mud in the vicinity of New Baltimore. We then took the hind barge and brought her around in front of the tug and put her crossways in front of the tug, and after we got the barge in front of the tug they worked the engine slowly up against the higher barge, up against the mud bank, so while I had the ice barge in front the engineer says, 'You better go and fix the fire.' So I went down and fixed the fire and went up again and went in the back end of the tug, and after I went out of the fire hole I looked back and saw that the line was slipping away from Coleman, and I ran and grabbed the line so as to get another turn on the post to hold the line, and in doing that there was a turn in the line, and when I threw my foot back I threw it in the hole, and when the line drew up there around the post it drew up against my ankle tight, and I was about 2½ feet from the post, and I hollered and screamed and hollered and Coleman also. Before I got to the post I tried to get the axe to chop the towline. The axe was right back of the cabin, about three feet and a half above the deck, and I pulled at the axe to get the blade out of there, and I couldn't do it, and I kept hollering, and I said to Coleman, 'Go to the front end of the tug and see if you can get the captain there,' and he came back and said the captain ain't there, so I looked through a window in the

back part of the engine room, and I could not see any engineer there, and I hollered and hollered, and finally I went around the tow post twice, and after I was all crushed to pieces the captain and engineer came and said, ' What is the matter?' I said: 'I am all crushed to pieces; back the tug up so I can get the line off;' and they backed the tug right away and stood me up on my foot and took the line off the ankle. I was drawn around the tow post twice."

He testified that the engineer and captain were not in their places, and that if they had been, they could have saved him from having his leg crushed. He also testified that the light on the stern did not amount to anything; that it was smoked up. He further testified that after they got him out of the rope they put him upon the captain's bed; that they gave him no medicine, and did not bandage his wound; that he begged the captain to abandon the barges and to take him to Detroit; that during the five hours he was on the tug he lost nearly all his blood and suffered great pain. In other portions of his testimony it appeared that during the entire two months of his employment he and Mr. Coleman had charge of the lines, of placing them on deck after they had been in use; that he knew how to take out the kinks; that it could be done in 20 or 25 minutes; that there were times when the tug was idle at the dock when plaintiff had an hour or two at a time with nothing to do; that Mr. Coleman and himself had charge of the lanterns and lights; that the tug had the requisite number of each; that it was the duty of Mr. Coleman and himself to keep them cleaned and lighted. It is also apparent from his testimony that he regarded the pilot house as the post of duty for the captain and the engine house for the engineer, when he testified that if they had been at their posts of duty he could have been saved. His testimony, however, shows that the tug had two barges in charge, one in the front and one in the rear; that when the accident occurred they were aground for the second time; that it was very dark; that the navigation was difficult where they were; that they were lost and

did not know where they were. His testimony shows that he had known the captain many years; that he had known the engineer for two years; that they and Mr. Coleman were all friendly with him. He testified that he had been in and about this little tug from soon after the time he went to work upon her, and knew her equipment. He also testified that when it came daylight, so they could see where they were, they started for Fair Haven, where Mr. Coleman was left behind, presumably to remain in charge of the barges and tug, while the captain and the engineer took the plaintiff, and, after a delay of 5 or 10 minutes, boarded the first suburban car and started toward Detroit. At Mt. Clemens they took him from the car to a hospital and put him in charge of the doctors. We discover no claim in the record of any claim of negligence after this.

Upon the motion for a new trial, the captain, Mr. Coleman, and Mr. Thomas made affidavits that the leg of plaintiff was bandaged, that they gave him stimulants and did all for him that they knew how to do. As to the application for a new trial, in view of the countershowing, it is very clear the court did not abuse its discretion in overruling the motion.

In relation to the directed verdict upon the record as made, it is clear that the plaintiff knew the condition of the line and the condition of the lights, and he and Mr. Coleman were responsible for their condition. It is also clear that, with a crew of but three persons besides the captain, and with two barges in tow, with the outfit aground, in a dark night, with the parties lost, that it should not be said that the post of duty for the captain was in the pilot house all the time, and for the engineer was in the engine house all the time. The testimony of plaintiff indicates that all of the officers had been on one of the barges to learn the situation. Neither should it be said that under these circumstances it was negligence not to start back to Detroit. The injury is an unfortunate one, but the plaintiff knew as much about the situation as

anybody, and he assumed the risk of the conditions. *Kean* v. *Rolling Mills*, 66 Mich. 277 (33 N. W. 395, 11 Am. St. Rep. 492); *Hayball* v. *Railway Co.*, 114 Mich. 135 (72 N. W. 145); *Rohrabacher* v. *Woodard*, 124 Mich. 125 (82 N. W. 797); *Fischer* v. *Goldie*, 132 Mich. 574 (94 N. W. 5); *Goga* v. *Foundry Co.*, 142 Mich. 340 (105 N. W. 859).

Counsel say (we quote from the brief) :

" In support of our contention under the second count, we desire to quote from 20 Am. & Eng. Enc. Law (2d Ed.), p. 201:

" 'Under the maritime law, when a seaman becomes ill or receives an injury, in the performance of his duty, it is incumbent upon the master to furnish means of cure, and to use all reasonable exertions for that purpose. He must provide medicines and medical treatment, and must see to it that the disabled seaman is properly lodged, properly nursed, and provided with proper food. This obligation lasts until the end of the voyage, and even longer, if nursing and medical treatment are still necessary to effect a cure. If such medical or surgical treatment as is required cannot be given on board, and the vessel is within a reasonable distance from a port where it can be given, it is ordinarily the duty of the master to put into that port. For neglect to perform his duty in any of the above respects the master is liable for such damages as result therefrom; but when there are proper medicines and medical directions on board a vessel, to meet the needs of a particular case, and some person who is competent to carry out the directions, the master is probably under no obligation to send a seaman ashore for better medical treatment, or to have a physician from on shore sent for.' "

A case bearing somewhat upon this question is *Johnson* v. *Holmes*, 173 Mass. 514 (53 N. E. 1000). We hardly know what counsel have in mind by this quotation. Our attention has not been called to any statute or any authority requiring a tug of under 30 tons burden, making short trips of less than 40 miles on the inland lakes, to have means of cure aboard for the seamen who become ill or injured. It cannot be said that under the circumstances disclosed by this record there was any such delay after

daylight came, in putting into port, as to constitute negligence. As before stated, there is no claim of negligence after plaintiff arrived at the hospital.

Judgment is affirmed.

McALVAY, BROOKE, BLAIR, and STONE, JJ., concurred.