COLE v. MAMER BRICK CO.

1. MASTER AND SERVANT—ASSUMED RISK—PERSONAL INJURIES.

It is a settled rule of law that an employee assumes the known risks of his employment, those ordinarily incident to his employment and those arising and becoming known to him in connection with it as carried on during his service.[1]

2. SAME—PROMISE TO REMEDY.

It is also well settled that if the employee continues in his employment with knowledge of dangerous conditions involving an abnormal risk, relying upon a promise of his employer to remedy such conditions, he is relieved of the assumption of the risk for a reasonable time after securing the promise.

3. SAME—TIME FOR PERFORMANCE OF PROMISE.

Where the employer agreed to remedy a dangerous condition of the platform on which the servant's duties called him to work by placing a cover over a considerable opening in the structure, on the succeeding Sunday, and the work was not done at the promised time as plaintiff was advised, he could not recover for injuries that he sustained several weeks after in falling from the platform.

Error to Berrien; Bridgman, J. Submitted November 4, 1914. (Docket No. 126.) Decided December 18, 1914.

Case by Luther E. Cole against the Mamer Brick Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed; new trial denied.

*O'Hara & O'Hara*, for appellant.

*Gore & Harvey*, for appellee.

---

[1] The authorities on the question of the servant's assumption of risk in continuing work on the master's promise to remove a specific cause of danger are gathered in a note in 40 L. R. A. 782.

STEERE, J.   On August 2, 1912, plaintiff was in-
jured by falling through an unguarded opening at the
edge of a platform upon which he was working in
the upper part of a one-story building of defendant
in which brick was being manufactured.  Imputing
the accident and his resulting injuries to the negli-
gence of defendant, by whom he was employed,
through failure to furnish him a safe place in which
to work, he brought this action in the circuit court
of Berrien• county, where he recovered a verdict and
judgment of $600, awarded as compensation for such
personal injuries.  Numerous exceptions were taken
during the trial, and errors have been carefully as-
signed upon them, presenting in various lights de-
fendant's reasons why the judgment ought not to be
sustained, the condensed substance of which is that
no negligence on its part is shown, that the platform
was in a reasonably safe condition, that plaintiff is
shown by his own testimony to have been guilty of
contributory negligence; for all of which reasons a
verdict should have been directed for defendant and
the verdict of the lower court should now be reversed
and no new trial granted.

Defendant owned and operated a plant for the
manufacture of brick near the city of Benton Harbor.
Clay for making the brick came from a nearby bank
and was conveyed into the upper part of the factory
building by small dump cars operated on a tramway
running from the bank into the building through an
opening in its gable end, within the pitch of the roof,
at an elevation of over 18 feet above the ground floor
upon which the brick machine set, with other equip-
ment above it.   They were drawn into the building
from about 150 feet distant by a cable, power for
which was furnished from the building.  The tram car
dumped at the side and discharged the clay into a
hopper conveniently near the track over the machin-

ery, from where it fell into a so-called granulator, thence passing by gravity through other appliances, essential to the process of manufacture until it reached the brick machine at the bottom. In the southeast corner of the building, adjacent to the place of dumping and slightly below the level of the track, was a platform for the person engaged in caring for and dumping the car to stand upon while doing such work. It was 12 feet long by 7 feet wide, and 18 feet above the ground floor, from which it was reached by a stairway. It extended a little over 6 feet to the east of the car track and, had it continued 5½ feet further east, would have connected with the side of the building near where it joined the slanting roof. This left, from the outer edge of the platform to the roof, an opening variously stated to be from 2 feet 6 inches to 3 feet 2 inches wide. Plaintiff fell through this opening to the floor beneath while engaged in dumping a car, striking first upon the line shaft and from there upon a barrel 11½ feet beneath, sustaining, as he testified, serious injuries.

The car, known as the Western Side Dump Car, was a small one, holding from 1½ to 2 yards of clay, and was emptied by releasing two chain hooks on one side, revolving or tipping the box of the car until its contents slid out, then pulling back or righting the box and refastening the chains. This could easily be done by hand. It was claimed by defendant that such was the proper way, and plaintiff had been so instructed. It was his custom to right the box by reaching from where he stood on the platform and catching over the edge of the box with the heel of a shovel, which he used around the place of emptying for various purposes, and then pulling towards him until the box was righted. He claimed this was an expeditious and customary way of doing it, practiced by himself and others, including the Mamer brothers under whom he

worked, and he had never been instructed to the contrary.

On the occasion in question, while righting a car in this manner, his shovel slipped and he fell backwards, going through the opening at the edge of the platform and next to the wall "head first—right backwards," as he described the event.

The ground of negligence upon which plaintiff seeks recovery is that by reason of the opening through which he fell being left uncovered and unguarded defendant was culpably delinquent in its duty to provide him a safe place in which to work. Plaintiff was a man of age and experience, familiar with his work and the conditions which surrounded it. He began his employment there in June, and the accident occurred on August 2d. The opening complained of was seen by him daily, and whatever dangers it created were known to him.

It is a familiar and well-settled rule of law that an employee assumes the known risks of his employment, both those ordinarily incident to the nature of it and those arising, and becoming known to him, in connection with it as carried on during his service. It is also a familiar rule that, if the employee continues in an employment with knowledge of dangerous conditions involving an abnormal risk relying upon a promise of the employer to remedy such conditions, he is relieved from the onus of having assumed such risk during a reasonable time for the promised repairs or changes to be made.

Plaintiff claims to have complained to his employers of the dangers which resulted in his injury and to have remained at his employment on the strength of promises to cover the opening and remove the risk. Defendant, denying the existence of any abnormal danger, or any promise to repair, contends in any event it is shown that plaintiff did not continue in the

employ by reason of such promise, nor in reliance upon it, and his own testimony discloses he remained for such an unreasonable length of time after the alleged promise was made that, as a matter of law, it affords him no protection, and he therefore cannot recover. Plaintiff's counsel clearly state the vital issue in their brief as follows:

"There is only one question in this case: Did the time that elapsed between the promise to repair and plaintiff's injury 'preclude all reasonable expectation that the promise might be kept?'"

Eliminating all issues raised by conflicting evidence and taking plaintiff's testimony as true, he testified, amongst other things, that in this building there were four men working besides himself, and he had charge of the "whole thing," looked after all the machinery, did the oiling, if anything needed fixing about the machines he fixed it, "and looked after everything in that room;" that he rigged a jack "up there" for dumping cars, because they were sometimes loaded heavier on one side and hard to lift; that he added one additional plank to the platform, on his own initiative, and placed a railing on the left side of it, about which he first spoke to "them" and was told to "fix it;" that he looked at this hole a number of times; did not know as he was afraid of it, but thought there was some danger of slipping and falling through it; that it would take but a short time, might take longer than 15 minutes but not over an hour, to cover the opening, requiring but two or three plank, and that there were plank in the yard which could be used for that purpose, and were used after he was hurt; that on one occasion Peter Mamer came up, and, noticing the jack which plaintiff had rigged, asked about it, and spoke in that connection of fixing something else also, in reply to which plaintiff said, "Now, Pete, that arrangement I have got is all right, provided there is

some more boards put in the floor so if I slip I would
not fall down through there," to which Peter replied
that would be done as soon as they could get to it;
that George Mamer came up not very long after and
talked about the granulator not working very satis-
factorily, saying he thought it would be necessary to
put some plank in to hold the clay off the knives, and
in discussing it plaintiff suggested, "We can use some
more plank in that floor there," and George Mamer
then replied, "Well, I will have George Sterling bring
some up from downtown, and we will have Bert Bald-
ing come up on Sunday morning and fix the floor and
the granulator;" that this occurred "about a month,"
or "probably a month," before the accident. Plaintiff
gave this promise as the one upon which he relied at
least four times in direct and cross-examination say-
ing, when interrogated as to why he remained in the
employment with the opening unguarded, and why he
did not cover it himself with available material:
"They said they would have Bert Balding come over
on Sunday and fix it. * * * They intended to fix
it and would fix it next Sunday morning"—his last
statement of the promise being, "And he said he would
have Bert Balding come over Sunday morning and
fix the granulator and the floor," repeating when
asked again, that the last promise to repair was about
a month before the accident.

Of the influence of this alleged promise to repair,
upon his conduct, he was asked and answered as fol-
lows:

"*Q.* Did you have in mind at any time you were
talking to Mamers about quitting their employment?
"*A.* No, sir.
"*Q.* Did not?
"*A.* No, sir.
"*Q.* So that there was nothing that the Mamers said
to you, either George or Peter, on the occasions you
refer to, a month or a month and two or three days

before the injury, that caused you to change your mind in any regard?

"*A*. No, sir."

It is difficult to reconcile this testimony with the theory that plaintiff's continuation in the service was due to or induced by a promise of his employer to remedy the defect. In *Hayball* v. *Railway Co.*, 114 Mich. 135 (72 N. W. 145), although the plaintiff there testified that he had in mind quitting the employment and "was going to leave" if a promise had not been made to fix a defective machine upon which he worked, and he remained relying upon a statement of the superintendent in charge that the defects would be remedied, this court said:

"It is impossible to reconcile plaintiff's acts with the theory that he remained at work, after he learned the machine was dangerously defective, relying upon a promise from the defendant that it would remedy the defect."

It was therefore held plaintiff could not recover and a verdict should have been directed for defendant.

Generally stated, the law upon the question of relieving promises is that when no specified time is designated by the employer in his promise for restoration or establishment of safe conditions, his right to urge as a defense the assumption of risk by the employee is suspended for a reasonable time in which to perform the promise, and in such cases what constitutes a reasonable time in which the employee may remain in the employ, relieved of all assumption of risk, is, as a rule and within rational limits, for the jury to determine under proper instructions according to the facts of each particular case. We must conclude, however, that plaintiff's testimony in this litigation presents no such issue.

The promise to which plaintiff testified, and upon which he claimed he relied, fixed the time of fulfill-

ment prior to the accident. He stated distinctly that the promise was to be performed the next Sunday after it was made. Several Sundays intervened before he was injured. This eliminated the element of promise, leaving no issue of fact as to a reasonable time for a jury.

When the period contemplated and agreed upon for removal of the dangerous condition terminated without its performance plaintiff's position was the same as if no promise had been given and he thereafter reassumed the risk.

"It is clear that in all cases where the circumstances were such that, if the promise had not been given, the servant's continuance of work would have rendered him chargeable, as a matter of law, with contributory negligence, this defense furnishes a conclusive bar to the action if the injury was received after the expiration of the period during which the servant was justified in relying on the performance of the promise." 4 Labatt on Master & Servant (1913), p. 3890.

The distinction is pointed out with remarkable clearness in the case of *Andrecsik* v. *Tube Co.*, 73 N. J. Law, 664 (63 Atl. 719, 4 L. R. A. [N. S.] 913, 9 Am. & Eng. Ann. Cas. 1006). In the concluding paragraph after a thorough review and analysis of the authorities, and discussion of the principles involved, the court says:

"The master, in the making of the promise, and the servant, in acting upon it, fix their mutual relation.

"Where the promise to make the repair is indefinite or inferential as to the time of performance, there may arise a question for the jury of reasonable time—on the part of the master for performance, and consequently on the part of the servant for continuing to incur the risk in the expectation that the master will perform.

"Where, however, the promise is express as to the time of performance, the rule is otherwise.

"A promise made by the master, acted upon by the servant, to repair a specific defect at a definite time

thereafter, creates an assumption of the risk by the master. This assumption of risk begins forthwith upon the making of the promise and continues thereafter and throughout the period fixed for the making of the repair; but this undertaking of the master terminates and his liability thereunder ceases at the end of that period. The termination of the master's undertaking and the termination of the period fixed for the repair are identical."

In view of these authorities, and for the reasons above given, we are constrained to hold that a verdict should have been directed for the defendant.

The judgment is reversed, and no new trial granted.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OS-
TRANDER, BIRD, and MOORE, JJ., concurred.