RIFFEL *v.* UNION TRUCK CO., LIMITED.

1. EVIDENCE—EXPERT AND OPINION TESTIMONY—NEGLIGENCE.
   Having shown all the facts and surrounding circumstances, the plaintiff in a personal injury case was not entitled to have a witness state his opinion as to what caused the wheel of the truck that plaintiff was driving, when his injury occurred, to come off, permitting one side of the vehicle to drop to the pavement.

2. MASTER AND SERVANT—ASSUMPTION OF RISK—NEGLIGENCE.
   In an action for personal injuries, the plaintiff, a teamster,

who admitted that he was charged with the duty of inspecting the truck which he drove and with oiling the wheel, assumed any risk of the nut or burr on the axle of the front wheel coming off, a result which was not shown to have occurred because of the flattening of the front axle by use and wear, as claimed by him, although such condition necessitated more frequent oiling.

Error to Wayne; Van Zile, J. Submitted April 27, 1914. (Docket No. 143.) Decided June 1, 1914.

Case by Eugene Riffel against the Union Truck Company, Limited, for personal injuries. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*William Van Dyke* and *Andrew F. Burleigh, Jr., (Willis G. Clarke, of counsel),* for appellant.

*Brennan, Donnelly & Van De Mark,* for appellee.

Plaintiff sued to recover damages for an injury received through the alleged negligence of defendant. A teamster of some 20 years' experience, he had worked for defendant as a driver upon one of their trucks upon this occasion for about one year and upon a former occasion for about five years. The record discloses that on a Friday morning plaintiff was instructed to take out truck No. 34, which he had not theretofore driven. He used this truck all day Friday and a part of Saturday in carrying machinery to the Stroh Brewery Company. The last load being delivered at the brewery, the plaintiff was instructed by Mr. Newman, defendant's foreman, to go to the Lake Shore depot and there get and deliver a load of paper. Plaintiff obeyed his instructions and loaded his wagon with about 9,000 pounds of paper and started to deliver it. At the corner of Bates and Woodbridge streets, as he was turning west from the street car track, the left front wheel of the truck came

entirely off, permitting the axle to fall upon the ground. This tilted the platform of the truck to such an angle that plaintiff was thrown forward and some of the paper was thrown upon him. He was cut somewhat about the head and sustained a fracture of several ribs and was otherwise injured. Plaintiff avers in his declaration that defendant—

"Negligently and carelessly furnished the said plaintiff with an unsafe truck, and one which the said defendant knew to be unsafe, or should have known in the exercise of that degree of care which the said defendant owed to the said plaintiff in the premises, in that the wheels and axles and the parts around and about the said wheels and axles were unsound and in improper condition, and were not properly maintained and cared for, and which particularly were in dangerous condition by reason of the carelessness, negligence, and neglect of the said defendant, either in the not keeping them in proper repair, or in not properly oiling and greasing them, or in not properly inspecting them."

The following facts may be said to be established by the record: The truck in question had what is known in the business as a flat axle; that is, through use the under part of the axle, where it goes through the boxing in the hub, had become somewhat worn. This condition is one in the process of making from the first day the truck is run. There is no evidence in the record that such a condition tends to render it unsafe, but it does require to be more frequently greased than an axle that is new and round. It is further established by the uncontradicted testimony that the nut or burr on the end of the axle came off before the wheel came off. The nut was some two inches larger in diameter than the hole in the hub into which the boxing was set. To have permitted the wheel to come off over the nut, an inch of solid wood all the way around on the inside of the hub would have had to be cut away. It is uncontradicted

that, though the boxing remained upon the axle after the wheel left it, immediately after the accident the boxing was taken from the axle, replaced in the hub, which was in good condition, and the wheel replaced upon the axle and the load delivered by another driver. It does not appear that the accident occurred by reason of the axle having run dry and heated, although the fact that the boxing remained on the axle might tend to indicate that condition. The man who made the repairs, however, testified that it was not dry. Plaintiff testified in part as follows:

"I drive any wagon they give me. It is all right whether I take wagon No. 1 or 20 or 34. It was part of my work to see that my wagon was oiled and was in good condition to go out—any wagon they give me. * * * When I broke down I had on a load of paper in 700-pound wooden boxes, pretty near four feet high. I had on 13 boxes and stood in front of the load on the front box. I had No. 34, which I had driven the day before.

"*The Court:* How often had you oiled it?

"*A.* I liked to see what it needs, only I didn't get the time.

"*The Court:* You didn't oil it?

"*A.* No.

"*The Court:* Why didn't you?

"*A.* I didn't get any time for it.

"*The Court:* Used it the day before?

"*A.* Yes, sir.

"*The Court:* A truck like that in use ought to be oiled every morning?

"*A.* No.

"*The Court:* Not before three or four days?

"*A.* Three or four days, yes.

"*Q.* When you took this out Friday morning, why didn't you oil it?

"*A.* When I took it out Friday morning?

"*Q.* Friday morning?

"*A.* I asked the foreman, because it was 5 minutes to 7, and the foreman says, 'You take this 34 and haul those boiler sections.'

"*Q.* Yes, sir.

"*A.* So I say I had better look at this truck before I take it out.

"*Mr. Donnelly:*   I renew my objection.

"*Mr. Van Dyke:*   It has been brought out on cross-examination.

"*The Court:*   I think that is all right.

"*A.* He says, 'Go ahead.'   He say, 'Run off some runs and get a run for you.'

"*Q.* How long does it take to grease those trucks?

"*A.* About ten minutes.

"*Q.* To grease each wheel?

"*A.* The whole wagon.

"*Q.* Did you know when you went back to work Saturday morning that you were going to take 34 out?

"*A.* Saturday morning, yes.

"*Q.* Saturday?

"*A.* Yes.

"*Q.* Now, why did you ask for permission to look it over when you got up to Stroh's brewery before you took the paper?

"*Mr. Donnelly:*   Same objection to all this testimony and exception.

"*Q.* And, when you asked at Stroh's brewery for a chance to look the truck over, what did he say?

"*A.* 'That is all right; go ahead.   That is all right; go ahead.   That is all right.'

"*Q.* Then you didn't look it over?

"*A.* I showed him this wheel where the tire come —this tire must be loose.   I don't know anything about the other wheel coming off.   I can't see nothing on the inside.

"*Q.* Which wheel was that you showed him?

"*A.* Right hind."

Leonard Wall, a witness for plaintiff, on direct examination, testified as follows:

"*Q.* Did you hear Mr. Riffel inquire Saturday morning for a chance—

"*A.* (interrupting) Yes, sir.

"*Q.* What was told him?

"*Mr. Donnelly:*   There was no testimony it was Saturday morning.

"*A.* Saturday morning was the day.

"*Mr. Van Dyke:* Saturday morning when you saw it?

"*A.* Yes, sir.

"*Q.* What was said?

"*A.* He asked the foreman of the Union Truck Company if he could have time to look over the wagon. He said: 'No, go ahead. It is all right.'

"*Q.* What morning was that?

"*A.* Saturday morning.

"*The Court:* He had driven the same truck the day before?

"*A.* He had driven the same truck the day before; yes, sir."

On cross-examination he testified:

"*Mr. Donnelly:* Q. Now, it is true, isn't it, that the teamsters are required to report about 6 o'clock?

"*A.* Six o'clock in the morning. They can come earlier if they wish.

"*Q.* Can come earlier if they wish?

"*A.* Yes, sir.

"*Q.* They have to be on the wagon 10 minutes to 7?

"*A.* Yes, that is the orders of the Union Truck Company.

"*Q.* If they don't get there and get their wagons fixed up before 10 minutes to 7 it is their fault, not the company's?

"*A.* If a wagon isn't fit to be taken out, takes out a new wagon. It is supposed to be looked into.

"*Q.* So if they are not there in time to look over the wagon, that is their fault?

"*A.* They do if they are put on a different wagon.

"*Q.* This was a different wagon. It is in the testimony that he used the wagon the day before?

"*A.* He used the wagon the day before, yes. He had orders to use this wagon; it was the same wagon the day before; it was a better wagon to haul paper on.

"*Q.* When did he get the orders?

"*A.* In the morning.

"*Q.* From the foreman?

"*A.* Yes, sir; he had orders to go with that wagon.

"*Q.* If this man took the wagon out the day before and was going to take it out on Saturday, it was up to him to get down early enough Saturday morning

to get that wagon fixed up before 10 minutes to 7, wasn't it?

"*A.* Why, he couldn't get at the wagon. How was he going to fit it?

"*Q.* Answer my question.

"*A.* It was jammed between wagons; he couldn't get at it.

"*The Court:* Is that his duty, to get down in the morning to get the wagon ready to go out?

"*A.* Yes, sir; if he has his old wagon.

"*The Court:* Does it make any difference what wagon if he had the wagon the day before?

"*A.* He don't know.

"*The Court:* How do you know?

"*A.* No teamster knows what wagon he is to take until the next morning.

"*The Court:* No teamster knows what he is to take until the next morning?

"*Q.* If he has his own wagon, that is for him to get ready?

"*A.* How can he get his wagon ready if he is busy all the morning moving—

"*Mr. Donnelly:* I move, the court please, that that be stricken out.

"*Q.* You remember that this wagon was used right steadily after that, was it not?

"*A.* It was used steadily after that, yes, sir, for a while.   *   *   *

"*Q.* I understand you to say the men do not know for sure what work they are going to do when they go down to the barn in the morning?

"*A.* He don't exactly know what wagon he is going to hook onto exactly.

"*Q.* The teamsters do not know for sure?

"*A.* No, sir.

"*Q.* So when you get there in the morning the foreman says which wagon you are to use?

"*A.* Yes.

"*Q.* And it is your duty to see that your wagon is in good condition to go out?

"*A.* Yes, if you have time.

"*Q.* You say on Saturday morning this man could not get at this wagon?

"*A.* No, sir; he couldn't.

"*Q.* No room?

"*A.* No, sir.

"*Q.* Why not?

"*A.* Not until he hooked up and pulled it in the yard past the other trucks could he get at it.

"*Q.* Did he have to be told to take it out in the yard to grease it?

"*A.* No, sir.

"*Q.* Can you take that in the yard, jack it up, and grease it?

"*A.* No, sir.

"*Q.* Why not?

"*A.* Because there was probably some wagons you can't use for a truck.

"*Q.* These wagons are not packed in so close?

"*A.* They are packed in so close that you cannot get off and out of the shed that they are in. The company want to get all the rigs in.   *   *   *

"*Q.* Did you say, 'I heard Mr. Herzog tell all drivers to look after the wagons before going out, and heard him so instruct Riffel?'

"*A.* Yes, sir; provided I have got time to do it. *   *   * It is a teamster's duty, when he goes down in the morning, to oil and take care of his wagon. That is what Mr. Herzog told our teamsters."

A verdict having been directed in favor of defendant, plaintiff reviews his case in this court by writ of error.

BROOKE, J. *(after stating the facts).* There are but three assignments of error:

"(1) The court erred in excluding the following question: 'What was that accident the result of, in your opinion?' propounded to the witness Leonard Wall by Mr. Van Dyke, attorney for plaintiff.

"(2) The court erred in stating in the charge to the jury that 'there is no proof of negligence.'

"(3) The court erred in directing a verdict for the defendant."

We are of opinion that the answer to this question was properly excluded. All the facts surrounding the accident had been detailed to the jury. It was for the jury to draw such legitimate inferences from those

facts as were warranted. It was not a case in which expert testimony was admissible. *Lemon* v. *Railway Co.*, 59 Mich. 618 (26 N. W. 791) ; *Jackson* v. *Railway Co.*, 161 Mich. 163 (125 N. W. 763).

The next two assignments of error may be treated together. They raise the controlling question in the case. In our opinion the verdict was properly directed for the following reasons: The only defect shown to exist in the truck at the time of the accident was that the axle on its underside was worn somewhat flat. It is uncontradicted that this flatness did not render the truck unsafe but that its existence necessitated a more frequent oiling than otherwise. The record clearly shows that the duty of oiling rested upon the plaintiff himself. It is not even shown that the accident occurred by reason of there being insufficient oiling. From all the testimony, the conclusion is inevitable that the accident and resulting injury was caused by the coming off of the nut or burr which holds the wheel upon the axle. This is an accident which, in turning and backing of wagons, we should suppose to be of no infrequent occurrence. It was such an accident as a casual inspection by the plaintiff would have averted, and, according to the testimony in the record, the duty of inspection rested upon plaintiff himself. Indeed, he himself says, "Any man with a new tool ought to look the tool over before he takes it out."

A glance at the alleged defective axle at the depot where plaintiff obtained his last load would undoubtedly have disclosed the condition of the nut. At the time he started from the depot, it must have been very nearly off, as the evidence discloses the fact that in going forward it was so threaded as to become tighter instead of looser through the friction between it and the end of the hub. We think the plaintiff, under the circumstances of this case, must be held to have as-

sumed the risk. *Prentiss* v. *Manufacturing Co.*, 63 Mich. 478 (30 N. W. 109) ; *Kean* v. *Rolling Mills*, 66 Mich. 277 (33 N. W. 395, 11 Am. St. Rep. 492) ; *Wheeler* v. *Berry*, 95 Mich. 250 (54 N. W. 876) ; *Breig* v. *Railway Co.*, 98 Mich. 222 (57 N. W. 118) ; *Gavigan* v. *Railway Co.*, 110 Mich. 71 (67 N. W. 1097) ; *Welch* v. *Brainard*, 108 Mich. 38 (65 N. W. 667) ; *Soderstrom* v. *Lumber Co.*, 114 Mich. 83 (72 N. W. 13) ; *Hayball* v. *Railway Co.*, 114 Mich. 135 (72 N. W. 145) ; *Mackey* v. *Furnace Co.*, 119 Mich. 552 (78 N. W. 783) ; *Goga* v. *Foundry Co.*, 142 Mich. 340 (105 N. W. 859).

In this connection it should be noted that the defect to which plaintiff called the attention of defendant's superintendent at the brewery company was not in any wise connected with the accident or injury; it consisting in a tendency of the tire on the rear right wheel to come off.

The judgment is affirmed.

MCALVAY, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.