## GATEWOOD v. CONSOLIDATED COAL CO.

1. Master and Servant—Personal Injuries—Promise to Repair Defect.

An assurance to plaintiff that the length of wire he had been using for the purpose of dynamiting stumps was safe and to use it until a longer one should be furnished was not such an assurance as would relieve the plaintiff of assuming the risk of his injury from the known danger.[1]

[1]The general question of the rights of a servant who continues work on the faith of his master's promise to remove a specific cause of danger is reviewed in a note in 40 L. R. A. 781. And for authorities on the question of contributory negligence as a defense to an action based on a breach of a master's statutory duty, see note in 49 L. R. A. (N. S.) 526.

2. SAME—ASSUMED RISKS.

When plaintiff undertook the work of blasting he knew he was engaging in an employment that involved the use of a dangerous agency and voluntarily assumed not only the generally known and ordinary perils of such service, but such other risks as became apparent to him from observation and experience.

3. SAME—EVIDENCE—CONTRIBUTORY NEGLIGENCE.

Testimony that plaintiff knew the wires with which he was dynamiting stumps were short and that he complained to his superior and asked for longer wires but was assured the wires were safe, and to use them until longer ones were furnished, that plaintiff used more dynamite in blasting than was required or safe, and was injured as a result, and that he had been properly warned, *held*, to be insufficient to relieve plaintiff of the charge of contributory negligence and that the court should have directed a verdict for the defendant.

Error to Saginaw; Kendrick, J. Submitted April 17, 1916. (Docket No. 10.) Decided July 21, 1916.

Case by Albert Gatewood against the Consolidated Coal Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed, and no new trial ordered.

*Humphrey, Grant & Humphrey*, for appellant.

*Purcell & Travers*, for appellee.

STEERE, J. Plaintiff recovered a judgment for personal injuries resulting from a blast of dynamite, which he exploded while in defendant's employ, engaged in blasting stumps in the process of clearing land on a farm of defendant, located in Buena Vista township, Saginaw county. Some time prior to the accident in question defendant purchased from plaintiff, or his wife, a house and some lots adjoining this farm, taking plaintiff, who was a farmer, into its employ under an arrangement that he should continue to re-

side in the house, which was then moved and repaired, and work upon the farm, acting as resident foreman or head workman under the direction and control of a Mr. Pugh, who was general superintendent in charge of several farms owned and operated by defendant.

From early in July, 1912, until he was injured on January 28, 1913, plaintiff had mostly worked at clearing an unimproved portion of this farm, using dynamite as an aid to that end. During most of this time the blasting was amongst small stumps and bunches of brush, requiring varying, but not large, charges. He had, however, become familiar with the nature of dynamite and the method of using it in clearing land, and had fired so many shots that he declined to estimate the number, beyond stating it was at least 1,000. The blasts were fired by an electric battery, carried in a small box, which was connected by two wires with the sticks of dynamite after they were placed under or in the object to be blasted. Percussion caps affixed to the charge were attached to the wires from the battery, and when the blast was all set it was fired by turning a little crank on the battery, which sent a current of electricity to the caps, causing the explosion. Small wires four feet long, or more, were attached to the caps on the sticks of dynamite to which the battery wires were connected in preparing for a blast; 250 feet of wire, or a doubled line 125 feet long, was provided to carry the electric current from the battery to the cap connections; 40 per cent. dynamite was used, stated to be a "weak strength." Plaintiff testifies that in the job of clearing upon which he commenced work in July they used dynamite from the beginning "and carried it straight through"; that the amount used for a blast "wasn't only from half a stick to a stick and a half or two sticks, according to the size of the timber we got into, until we got into the

big, heavy stuff, big heavy stumps, and then he (Pugh) showed the way himself."

Pugh made frequent visits to the farm, watching and directing the progress of plaintiff's work, cautioning him against using more dynamite than was necessary to produce desired results, both for economy and because it was dangerous, telling him the more he used the greater was the danger. Early in the progress of the work he found plaintiff had put his son, a young man 18 or 19 years of age, at loading and firing the blasts, and told him it was decidedly wrong to allow the boy to handle dynamite, cautioned him of the dangers attending its use, and said he wanted him to put his son at other work, to which plaintiff assented. Thereafter a workman named Campbell, whom plaintiff hired by permission of Mr. Randall, defendant's general manager, worked with and assisted plaintiff in the blasting. Campbell testified that he had some previous experience in blasting stumps with dynamite, that plaintiff was his "boss," and directed him in his work when Pugh was absent.

In the morning of the day plaintiff was injured Pugh visited the farm, and while there gave directions for blasting some large stumps. He remained until noon and took charge of the work, directing plaintiff and Campbell how to do it, blasting three of the large stumps himself, one of which Campbell and Pugh both testified was three feet in diameter, using five sticks of dynamite in the largest ones and four under a smaller one. Plaintiff stated that he "was there to watch him, and see how he wanted it done," but did not observe how many sticks of dynamite were used, nor ask Pugh about it, because it "wasn't none of my business." Pugh left at noon. During the afternoon, after blasting two large stumps safely, plaintiff was struck over the eye and injured by a flying piece from

an elm stump about two feet in diameter which he had charged with nine sticks of dynamite. The full extent of his injuries, while in dispute, is not involved in the controlling questions presented here.

The breaches of duty alleged in plaintiff's declaration, upon which it is sought to predicate actionable negligence, are, condensely stated, failure to provide plaintiff a safe place to work, to advise and warn him of the dangers incidental to blasting stumps, especially when the ground is frozen, and of exploding dynamite with electricity in doing such blasting, failure to furnish him wire of sufficient length to operate the battery used in firing the blasts at a reasonably safe distance from the place of explosion, and neglect to supply him with sufficient wire for that purpose after promise to do so by the superintendent in charge of the work. The only ground upon which recovery was permitted, and an issue of fact submitted to the jury by the trial court, was the alleged breach of defendant's promise and duty to furnish plaintiff with more wire for use in blasting. The court instructed the jury, correctly we think:

"That there is no evidence in this case showing or tending to show that the plaintiff was not sufficiently instructed and warned as to the dangerous character of these appliances and of the business which he was performing, the apparatus used, and the general dangers surrounding the business, and the fact that he had been working upon this job in the manner in which he was for some seven months prior to the happening of this accident, and as he must have been well informed concerning the apparatus he was using, as the same was open and obvious;  *  *  *  I feel it my duty, therefore, to charge you that the claim that plaintiff was not properly instructed, or had not proper knowledge concerning this matter, should not be considered by you, in view of the fact that he had been engaged in the business for seven months, having charge of it."

It appeared that the wires for connecting the battery with the charge to be exploded had become reduced in length while in defendant's use by little pieces being blown off the ends when blasting. The testimony as to their length at the time of the accident is in conflict; plaintiff claiming it to have been 55 feet, and defendant 75.11 feet.

It was claimed that plaintiff complained to Pugh on three different occasions of the shortness of the wires, asking him for longer ones, but was ordered to continue its use under both assurances that it was sufficiently long to safely use and a promise that longer wires would be furnished. Manifestly the degree of safety, or danger, in firing a blast was contingent on the size of the charge fired as well as the length of the wires. Plaintiff controlled the size of the charge and knew the length of the wires. Under the theory that the testimony upon this subject raised an issue of fact as to an exception to the general rule of assumed risk —in the particulars of defective appliances, complaint by the workman, promise to supply or repair, and continuing in employment using the defective appliance in reliance upon such promise—the court submitted that question to the jury. Accepting in full all plaintiff's testimony upon that subject as true, which defendant denies, we find in it no certain promise of Pugh to repair, or furnish longer wire, in reliance upon which plaintiff was relieved from assumption of the immediate and obvious risks incident to continuing the work he was engaged in. His testimony as to complaints and promises, which it is claimed required submission of that question to the jury, is as follows:

"It was about three weeks before my injury that I had my first talk with him.   *   *   *

"Q. What did you say to him, and what did he say to you?

"A. I asked him if he couldn't get us a longer wire.

I told him I thought that wire was getting pretty short and that it was dangerous.

"Q. What did he say?

"A. He said it was not. He said to me to go ahead and use it until he got another wire.

"Q. Then did you have any other talk about it?

"A. At another time I did. It was about a week afterwards, after the first one.   *   *   *

"Q. Now, what was said at that conversation?

"A. He said it was safe—to go ahead and use it until he could get a longer wire.

"Q. What, if any, excuse did he give for not furnishing the wire?

"A. He didn't give any.

"Q. Then did you have any other further talk with him about it?

"A. The same day when I got hurt, at noon, Mr. Campbell was there.

"Q. Now, go on and state what you said to Mr. Pugh.

"A. I asked Mr. Pugh if he couldn't give us a longer wire. He said, 'That is perfectly safe.' He said, 'Go ahead and use it until I get another one.'"

We discover in this no promise that a longer wire would be furnished at any time. At most, there was but an intimation that one might be some time, with assurances that the one in use was sufficient and reasonably safe, if properly used. At the time of the last claimed complaint and assurance Pugh had worked with the blasting appliances himself during the forenoon, and had just safely blasted a larger stump than the one plaintiff was injured in blasting. Plaintiff makes no showing that he would have quit, but for promises to furnish longer wire. He was experienced in the use of dynamite and the effect of explosions in blasting stumps, had equal knowledge with Pugh how the appliances were used and the length of the wire. Recovery cannot be predicated in this case on bare assurances of safety. *Kean* v. *Rolling Mills*, 66 Mich. 277 (33 N. W. 395, 11 Am. St. Rep. 492) ; *Rohrabacher* v. *Woodard*, 124 Mich. 125 (82 N. W. 797) ; *Hayball*

v. *Railway Co.*, 114 Mich. 135 (72 N. W. 145) ; *Riffel* v. *Truck Co.*, 180 Mich. 673 (147 N. W. 522) ; *Kelley* v. *Davison*, 185 Mich. 123 (151 N. W. 671).

Plaintiff offered no evidence of the customary and proper length of wire commonly furnished and used by prudent and careful persons for blasting of the kind he was engaged in. It appeared that the equipment with which he was supplied had been efficiently used without accident by himself and Pugh in blasting stumps, both small and large, even to green elm stumps over two feet in diameter, when carefully done, with moderate, but adequate, charges of explosive. Plaintiff, in testifying as to their general manner of taking out stumps by the use of dynamite, said, "Mr. Pugh ordered us to make light shots on them, to loosen them," and had subsequently cautioned him, at least "one time," as he admitted, about his using too much dynamite. Yet for the blast which injured him he loaded the stump with nine sticks of dynamite. He had watched Pugh blast a larger stump that morning with five sticks, and was there "to see how he wanted it done," although he denies knowing how many sticks were used. In a series of equivocal replies as to how he came to use so many sticks, he stated:

"There wasn't any amount of dynamite mentioned; only he said to fill the holes full."

The holes were bored under plaintiff's directions after Pugh left, and when asked if that was not left to his judgment, he replied:

"I don't know whether it was left to my judgment or not. * * * It wasn't left to me any more than it was to Campbell."

Campbell testified that he said to plaintiff "it was quite dangerous" to put in so much dynamite; that he would not himself turn the crank, and told him, "I wanted him to give me lots of chance to get away,"

and "I took and went away." Plaintiff stood in the open to fire the blast, and it was shown that he would have found protection from flying pieces by stepping behind a brush pile, there being four large ones, from 4 to 10 feet high, within 40 feet of the stump, and beyond that a large one, from back of the thickest portion of which to the stump was 75 feet.

When plaintiff undertook this blasting, he knew he was engaging in an employment involving the use of a dangerous agency, and voluntarily assumed, not only the generally known and ordinary perils of such service, but such other risks as became apparent to him from observation and experience. In doing the work it was his duty to "make light shots," as he had been instructed, according to the equipment and results to be accomplished, resort to all readily available means of protection, and exercise such care and caution as a reasonably careful and prudent person would under like circumstances. To recover in this action it was incumbent upon him to prove that he did so, and was guilty of no contributory negligence. From what plaintiff is shown to have done and seen, and admitted he knew and understood, the conclusion seems to us inevitable that his own carelessness, recklessness, and misconduct in overcharging this blast and then needlessly exposing himself when firing it amount to such contributory negligence on his part as precludes recovery.

The judgment is reversed, without a new trial.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, BROOKE, and PERSON, JJ., concurred.